**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| Citrus City Family Counseling, Inc., Individually, and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CHANGE HEALTHCARE INC.,<br><br>Defendant. | Case No.: ________<br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Citrus City Family Counseling, Inc. ("Citrus" or "Plaintiff"), on behalf of itself and all others similarly situated, brings this Class Action Complaint against Defendant Change Healthcare Inc. ("Change Healthcare," "Change," or "Defendant"). Plaintiff alleges as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to itself, which are based on personal knowledge.

## INTRODUCTION

1. Plaintiff brings this action to remedy the harms by Defendant's failure to adequately and reasonably protect its computer systems and payment networks, resulting in one of the largest cyberattacks impacting the entire healthcare delivery system, healthcare providers and patients throughout the United States.

2. The cyberattack on Change, which operates the largest clearinghouse for medical claims in the U.S. was reported to have "forced [Change] to disconnect more than 100 systems on Feb. 21. Since then, Change has been unable to process medical claims through its primary platforms […] Physician-owned medical groups, psychiatry practices and private practitioners across the U.S. have seen cash flow dry up. Some have been forced to furlough staff or use their

own money to pay employees […] the amounts being held back can range from thousands to millions of dollars per organization in the month since the attack."[1]

3. Plaintiff is one of those entities that has been impacted by the cyberattack upon Change and has been unable to have its claims processed and paid. It is estimated that the disruptions from Change's cyberattack and its subsequent response, have cost healthcare providers as much as $1 billion a day, as they struggle to stay afloat without being paid for the services they provided.[2]

4. Plaintiff brings this class action on behalf of itself and a class of entities who have been harmed by Defendant's failure to properly secure and safeguard information within its computer networks which was unlawfully accessed and/or exfiltrated by unauthorized third parties during a data breach that exploited a vulnerability in its software technology on or about February 21, 2024, causing the nationwide payment disruptions in the processing of medical claims (the "Data Breach").

5. The ransomware group known as "ALPHV/BlackCat" claimed responsibility for the cyberattack facilitated by exploiting the vulnerability in Change Healthcare's software in order to exfiltrate data from the underlying databases.[3] CISA reports that ALPHV/BlackCat has been known both to exfiltrate data and to ransom exfiltrated data for profit.[4]

---

[1] *Change Healthcare Hack: What You Need to Know*, The Wall Street Journal (Mar. 27, 2024) https://www.wsj.com/articles/change-healthcare-hack-what-you-need-to-know-45efc28c?page=1

[2] https://www.axios.com/2024/03/11/hospitals-doctors-cyberattack-losses (last accessed Apr. 16, 2024)

[3] *ALPHV/BlackCat Responsible For Change Healthcare Cyberattack*, The Register (Feb. 26, 2024), https://www.theregister.com/2024/02/26/alphv_healthcare_unitedhealth/ (last accessed Feb. 29, 2024).

[4] *#StopRansomeware: ALPHV Blackcat*, Cybersecurity and & Infrastructure Sec. Agency (updated Feb. 27, 2024) https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-353a (last accessed Feb. 29, 2024).

6. According to The HIPAA Journal, "The Blackcat ransomware ground claims to have stolen a vast amount of data from Change Healthcare in the recent cyberattack. In a statement posted, and later removed from its data leak site, a member of the group claimed to have stolen 6TB of data from UnitedHealth, Change's parent company, which the group alleges includes 'highly selective data' from all Change Healthcare clients, including Medicare, CVS Caremark, Health Net, and Tricare, the U.S. military medical health agency. Screenshots of some of the data were shared as proof of data theft. The group claims to have stolen the data of millions of patients, including medical records, insurance records, dental records, payment information, claims information, and patients' PHI, including health data, contact information, and Social Security numbers. The group also claims to have stolen the source code of Change Healthcare payment processing and adjudication applications."[5]

7. Change Healthcare confirmed in a notice to customers that ALPHV/BlackCat was behind the cyberattack. Specifically, Change Healthcare issued a statement confirming that it is "experiencing a cybersecurity issue perpetrated by a cybercrime threat actor who has represented itself to us as ALPHV/Blackcat."[6] Defendant's notice to customers further stated, "Our experts are working to address the matter and we are working closely with law enforcement and leading third-party consultants, Mandiant and Palo Alto Network, on this attack against Change Healthcare's system. We are actively working to understand the impact to members, patients and customers."[7]

---

[5] *Blackcat Ransomware Group Claims 6TB of Data Stolen in Change Healthcare Cyberattack,* The HIPAA Journal (Feb. 29, 2024), https://www.hipaajournal.com/change-healthcare-responding-to-cyberattack/ (last accessed March 1, 2024)

[6] *Change Healthcare Cyberattack Fallout Continues*, Tech Target (Feb. 29. 2024), https://healthitsecurity.com/news/change-healthcare-disconnects-system-amid-cyberattack#:~:text=Change%20Healthcare%20has%20confirmed%20that,latest%20notice%20to%20customers%20stated. (last accessed March 1, 2024).

[7] *Id.*

8. The information compromised in the Data Breach includes, personally identifiable information ("PII") and protected health information ("PHI"), including but not limited to, patient medical and patient payment information.[8] Additionally, the Data Breach caused Change Healthcare to experience a significant outage in its computer networks, resulting in severe disruptions in Change's "ability to send payments to providers or members being reimbursed for care [was] crippled, delaying payments in the tens of millions of dollars."[9] Medical providers like Plaintiff have been impacted by the Data Breach as they have been unable to submit medical claims for payment.

9. Change Healthcare's software is used by a large number of pharmacies and healthcare providers to allow technicians the ability to process claims for services through direct remote access to desktops, mobile devices, and more. Since the Data Breach, a multitude of pharmacies and healthcare providers have reported that they have been unable to process claims, impacting their regular day to day operations. The large number of companies that have reported being impacted by the breach underscores the widespread effect and deep consequences of this Data Breach.[10]

---

[8] *Update: Some Applications are Experiencing Connectivity Issues., Incident Report for Optum Solutions*, Optum, https://status.changehealthcare.com/incidents/hqpjz25fn3n7 (last accessed Feb. 29, 2024).

[9] *Change Healthcare Cyberattack Is Still Disrupting Pharmacies, Other Providers*, Bloomberg (Feb. 27, 2024), https://www.bloomberg.com/news/articles/2024-02-27/fallout-from-change-healthcare-hack-still-roiling-health-care (last accessed Apr. 16, 2024).

[10] *See, e.g.*, *Pharmacies Across US Disrupted Following Hack at Change Healthcare Network,* Reuters (Feb. 22, 2024), https://www.reuters.com/business/healthcare-pharmaceuticals/change-healthcare-network-hit-by-cybersecurity-attack-2024-02-22/ (last accessed Feb. 29, 2024).

10. Change Healthcare is one of the largest healthcare technology companies in the country, processing about 50% of medical claims in the United States for approximately 900,000 physicians, 33,000 pharmacies, 5,500 hospitals and 600 laboratories.[11]

11. Change Healthcare processes 15 billion healthcare transactions each year and is involved in one of every three patient records.[12]

12. This Data Breach has disrupted the payment process for entities who provide healthcare services nationwide, impeding their ability to timely receive payments for medical services rendered to patients. According to John Riggi, national advisor for cybersecurity and risk at the American Hospital Association, "… [T]his cyberattack has affected every hospital in the country one way or another."[13] The aftermath of the Data Breach has led to the rejection of insurance claims, leaving insurance providers the inability to pay healthcare providers. Small, mid-sized, and even large practices cannot withstand the lack of cash flow. Without Change Healthcare's systems operating properly, the outstanding payment will cause healthcare providers the inability to make payroll, require taking additional lines of credit, suffer increased debt from interest accumulation, and more financial harm.

13. Additionally, the Data Breach has impacted the timely processing and payment of medical services, the filling of pharmacy prescriptions and has resulted in harm to patients as well.

---

[11] *US health departments open probe into UnitedHealth hack*, Reuters (Mar. 13, 2024) https://www.reuters.com/technology/cybersecurity/hhs-opens-probe-into-hack-unitedhealth-unit-2024-03-13/ (last accessed Apr. 14, 2024).

[12] *Letter to Health Care Leaders on Cyberattack on Change Healthcare*, U.S. Department of Health and Human Services (Mar. 10, 2024), https://www.hhs.gov/about/news/2024/03/10/letter-to-health-care-leaders-on-cyberattack-on-change-healthcare.html (last accessed Apr. 15, 2024).

[13] *CBS EVENING NEWS Cyberattack on UnitedHealth still impacting prescription access: "These are threats to life"*, CBS News (Feb. 29, 2024) https://www.cbsnews.com/news/unitedhealth-cyberattack-change-healthcare-prescription-access-still-impacted/ (last accessed Apr. 15, 2024).

14. Defendant was responsible to provide adequate data security measures to protect the sensitive PII and PHI that was transmitted using its systems. Defendant knew that the type of personal and sensitive data that it received and transmitted is highly targeted and sought after by hackers who seek to exploit that data for nefarious purposes. Change's actions resulting in the Data Breach allowed cybercriminals to cause significant harm to Plaintiff and the Class.

15. Defendant Change Healthcare Inc. is a health technology company that provides pharmacies and health care providers in the United States with tools that allow them to electronically process claims and other essential payment and revenue management practices.[14] As part of its business operations, Change Healthcare operates as a clearinghouse to provide software tools to its clients.

16. The Data Breach was a direct and proximate result of Defendant's failure to implement and follow basic security procedures. Plaintiff's and Class Members' are healthcare providers whose ability to process and adjudicate claims to receive payments from insurance companies and patients was impacted by the Data Breach. Because of the Data Breach, providers like Plaintiff and the Class were unable to receive monies for the services they rendered, threating their ability to fund day to day operations. Plaintiff and Class Members have been injured and face an increased inability to continue funding their respective businesses and engage in the regular course of business. Consequently, Plaintiff and Class Members have been unable to receive compensation for the services they have rendered, forcing them to obtain bridge loans, lines of credit and deplete their cash to continue operating.

---

[14] Change Healthcare, https://www.changehealthcare.com/platform (last accessed Feb. 29, 2024).

17. Plaintiff brings this Complaint on behalf of itself and all others who were harmed by the Data Breach. Plaintiff asserts claims for negligence, negligence per se, violations of California's Unfair Competition Law, and declaratory judgment.

## PARTIES

18. Plaintiff Citrus City Family Counseling, Inc. ("Citrus" or "Plaintiff"), is a California corporation, with its principal place of business in Riverside, California. Citrus employs a team of approximately 17 clinicians who provide individuals with mental healthcare therapy, treatment, and coaching services. As part of Citrus' operations, Plaintiff submitted insurance claims through Change Healthcare's network systems for payment. Since the Data Breach, Citrus has provided services to numerous patients and has been unable to receive payments for those services.

19. As a result of the Data Breach, on or about February 28, 2024, Plaintiff's ability to receive payments for the medical services it rendered was disrupted, causing Plaintiff to have to provide services without compensation. As a result of the Data Breach, Plaintiff has received numerous notifications informing Plaintiff that its claims for payment by insurance companies were being rejected due to the inability to process claims directly resulting from the Data Breach. Plaintiff has had to spend its time contacting insurance providers in an effort to attempt to submit claims for payment and has to spend time and money to obtain alternative services to process its claims for payment – time and expenses which it would not have had to expend but for the Data Breach.

20. Plaintiff has been further harmed by the Data Breach as the lack of payments due to the Data Breach has caused Plaintiff to obtain a line of credit in order to pay Plaintiff's employees, its business expenses and to keep the business afloat until it is able to start receiving regular payments for the service Plaintiff renders.

21. Given the uncertainty of Change Healthcare's network operation, and as a result of its systems being shut down following the cyberattack, Plaintiff has been harmed as it has been unable to obtain payment for the healthcare services provided to the vast majority of its patients and/or clients. Plaintiffs or their billing agents are unable to submit invoices to Change Healthcare, and, as a result, insurers are unable to process and pay claims for services Plaintiffs provided. This caused, and continues to cause, Plaintiffs to suffer significant monetary losses and other harms.

22. Defendant Change Healthcare Inc. is a for-profit Delaware corporation with its principal place of business located at 424 Church Street, Suite 1400, Nashville, Tennessee 37219. Defendant Change Healthcare is a citizen of the States of Delaware and Tennessee.

**JURISDICTION AND VENUE**

23. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because Plaintiff and at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

24. This Court has specific personal jurisdiction over Defendant Change Healthcare because it is a citizen of this District, registered to conduct business in this District, maintains its principle place of business in this District, has continuous and systematic contacts with this District, does substantial business in and within this District, receives substantial revenues from marketing, distribution, and sales in this District, so as to subject itself to the personal jurisdiction of this District, and thus rendering the exercise of jurisdiction by this Court proper and necessary.

25. This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in Tennessee and because Defendant conducts a substantial part of its business within this District.

## FACTUAL ALLEGATIONS

### A. Defendant Provides Technology Services Involving Highly Sensitive Data.

26. Defendant Change Healthcare is a Tennessee-based healthcare services and support company operating as a clearing house that provides remote access software to pharmacies and healthcare providers to communicate with patients and facilitate the electronic adjudication of claims and payments.[15]

27. Change Healthcare provides "data and analytics, plus patient engagement and collaboration tools" to "providers and payers [to] optimize workflows, access the right information at the right time, and support the safest and most clinically appropriate care."[16] Change is one of the largest processors of healthcare related payment solutions in the United States and handles billing for more than 67,000 pharmacies across the country through which it handles 15 billion healthcare transactions annually.[17]

28. In order to provide these services, Change Healthcare acquires, collects, and stores the PII and PHI of the individual-patients with whom its pharmacies and healthcare providers service, including those individuals' names, contact details, healthcare insurance information, medical records, dental records, and payment information.

29. Due to the sensitivity of the PII and PHI that Change Healthcare handles, it is aware of its critical responsibility to safeguard this information—and, therefore, how devastating its theft is to individuals whose information has been stolen.

---

[15] Change Healthcare, *supra* note 14.
[16] *The Change Healthcare Platform,* CHANGE HEALTHCARE, https://www.changehealthcare.com/platform (last visited Mar. 1, 2024)
[17] Zack Whittaker, *UnitedHealth confirms ransomware gang behind Change Healthcare hack amid ongoing pharmacy outages,* TECHCRUNCH (Feb. 29, 2024, 9:15 AM) https://techcrunch.com/2024/02/29/unitedhealth-change-healthcare-ransomware-alphv-blackcat-pharmacy-outages/.

30. By obtaining, collecting, and storing PII and PHI, Change Healthcare assumed equitable and legal duties to safeguard and keep confidential patients' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures. Change Healthcare exemplifies its understanding of these duties, promising that "Change Healthcare is committed to the privacy and security of healthcare data and meets or exceeds HIPAA Privacy and Security Rule requirements."[18]

31. However, despite the imposition and acknowledgement of these duties, Change Healthcare failed to implement reasonable data security measures to protect patients' PII and PHI, and ultimately allowed nefarious third-party hackers to compromise patients' PII and PHI during the Data Breach.

32. Upon information and belief, Change Healthcare utilizes remote access software and on-premises hardware to conduct its business operations. By using on-premises hardware, *i.e.*, a server, Change Healthcare had physical control over the server that was compromised at the time of the Data Breach.

33. Despite Defendant's promise to protect sensitive data and efforts to portray themselves as capable data custodians, Defendant's own data security decisions created substantial gaps that Defendant knew or should have known created a risk of a data breach. That risk materialized in February 2024, when hackers broke into Defendant's system and stole highly sensitive data at will and put patients at risk that their data would be misused and cause them harm.

## B. The Change Healthcare Data Breach

34. Change Healthcare provides remote network software and services to entities such as hospitals, medical providers and pharmacies.

---

[18] *Privacy And Security*, Change Healthcare, https://support.changehealthcare.com/customer-resources/hipaa-simplified/privacy-security (last accessed Feb. 29, 2024).

35. Change Healthcare provides software allowing entities such as Plaintiff to submit claims to be adjudicated thereby allowing such claims to be paid.

36. Beginning on or around February 21, 2024, the notorious ALPHV/BlackCat ransomware gang exploited a vulnerability in Defendant's software and accessed, copied, and stole patients' PII and PHI that was processed and stored on Change Healthcare's server.[19]

37. According to information posted by a member of the ALPHV/BlackCat group who claimed to have stolen 6TB of data from UnitedHealth, which the group alleges includes "highly selective data" from all Change Healthcare clients, including Medicare, CVS Caremark, Health Net, and Tricare, the U.S. military medical health agency. Screenshots of some of the data were shared as proof of data theft. The group also claims to have stolen the source code of Change Healthcare applications. The group claims to have stolen the data of millions of patients, including medical records, insurance records, dental records, payment information, claims information, and patients' PHI, including health data, contact information, and Social Security numbers.[20]

38. The vulnerability allowed ALPHV/BlackCat to bypass authentication restrictions and gain unauthorized access to customer environments.[21]

39. On February 22, 2024, UnitedHealth Group Incorporated filed a Form 8-K confirming that on February 21, 2024, it identified a suspected nation-state associated cyber security threat actor had gained access to some of the Change Healthcare information technology system.[22]

---

[19] CISA, *supra* note 4.
[20] The HIPAA Journal, *supra* note 5.
[21] CISA, *supra* note 4.
[22] *See* UnitedHealth Group Inc., Current Report (Form 8-K), SECURITIES AND EXCHANGE COMMISSION (Feb. 22, 2024), https://www.sec.gov/Archives/edgar/data/731766/000073176624000045/unh-20240221.htm (last accessed Feb. 29, 2024).

40. Based on Change Healthcare's reporting, the information compromised in the Data Breach includes, *inter alia*, patient medical records, patient dental records, and patient payment information.

41. Following the Data Breach, Change Healthcare took steps to disconnect its systems after identifying the attack. As a result, Healthcare providers who utilize Change Healthcare for payment solution services were no longer able to submit insurance claims through Change Healthcare's systems. Change Healthcare sends the claims to health insurance companies for evaluation and processing. Providers then receive reimbursement payments from the insurance company.

42. The Change Healthcare systems were inoperable from the time of the breach and was projected to remain inoperable through at least mid-March.[23] On March 18, 2024, Change Healthcare notified customers that its systems were operational and that entities could begin to submit claims again during the week of March 25, 2024.

43. Given that the Change Healthcare processes 15 billion healthcare transactions (or about one-in-three U.S. patient records), the Data Breach disrupted a massive amount of healthcare providers' claims. For healthcare providers reliant on Change Healthcare's services, the breach halted the processing of their claims, causing significant disruption across the industry.

44. The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic data security procedures.

**C. Defendant's Insufficient Data Security Caused the Data Breach.**

45. Security experts, both private and governmental, have long warned companies that data security must be a top priority. The Federal Trade Commission ("FTC"), for example, has

---

[23] *Information on the Change Healthcare Cyber Response*, UnitedHealth Group https://www.unitedhealthgroup.com/changehealthcarecyberresponse (last visited March 13, 2024)

also issued numerous guidelines for businesses highlighting the importance of reasonable data security practices. The FTC notes the need to factor data security into all business decision-making.[24] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; using industry tested and accepted security methods; (5) monitoring activity on networks to uncover unapproved activity; (6) verifying that privacy and security features function properly; (7) testing for common vulnerabilities; and (8) updating and patching third-party software.[25]

46. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act").

47. As such, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ⁋ 7 (June 15, 2011) ("[Defendants] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ⁋ 7 (Mar. 7, 2006) ("[Defendants] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-

---

[24] *Start with Security A Guide For Business, Lessons Learned from FTC Cases*, Federal Trade Comm'n (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed Feb. 29, 2024).
[25] *Id.*; Federal Trade Comm'n, *Protecting Personal Information, A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Feb. 29, 2024).

4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendants] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all proceeded Defendant's Data Breach, further clarify the measures businesses must take to meet their data security obligations.

48. Although Defendant's business involves handling highly sensitive data, Defendant implemented inadequate data security practices that it knew or should have known, especially as a technology company and purported expert in the field, put their clients and their client's customers at risk of having their PII and PHI exposed.

**D. The Data Breach was a Foreseeable Risk of which Defendant was on Notice.**

49. It is well known that PHI and PII are highly sensitive and are frequent, intentional targets of cybercriminals. Companies that collect and handle such information, including Defendant, are well aware of the risk of being targeted by cybercriminals.

50. Defendant also knew that a breach of its computer systems, and exposure of the sensitive information stored therein, would result in harm to such individuals.

51. PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such

commerce."[26] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

52. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. According to the IRTC, in 2022, there were 1,802 reported data compromises in the United States, the second highest number of data events in a single year and only 60 events short of the record high number of events that occurred in 2021.[27] Of the 1,802 compromises reported in 2022, 98.4% were data breaches, affecting at least 392,180,551 victims in total, and 83% involved the exposure of sensitive records.[28]

53. In tandem with the increase in data breaches, the rate of identity theft and the resulting losses has also increased over the past few years. The Bureau of Justice Statistics reported that, in 2021, about 23.9 million people in the United States were victims of an identity theft incident, and their losses totaled $16.4 billion.[29] The increasing rate of identity theft is apparent from the directly preceding Bureau of Justice publication, which covered the data from 2018. From 2018 to 2021, the number of persons affected increased by approximately one million, and monetary losses increased by $1.3 billion.[30]

---

[26] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last accessed Feb. 29, 2024).
[27] *Data Breach Reports: 2022 End of Year Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 25, 2023), at 7, https://www.idtheftcenter.org/publication/2022-data-breach-report (last accessed Feb. 29, 2024).
[28] *Id.* at 6, 21.
[29] Erika Harrell & Alexandra Thompson, Victims of Identity Theft, 2021, BUREAU OF JUST. STAT. (Oct. 2023, NCJ 306474), https://bjs.ojp.gov/document/vit21.pdf (last accessed Feb. 29, 2024).
[30] Erika Harrell, Victims of Identity Theft, 2018, BUREAU OF JUST. STAT. (Apr. 2021, NCJ 256085), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed Feb. 29, 2024).

54. PII has considerable value and constitutes an enticing and well-known target for cybercriminals. Hackers can easily sell stolen data as a result of the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[31] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

55. Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020 [32]

56. Because of the value of PHI, the healthcare industry, specifically, has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[33] Indeed, "[t]he IT environments of healthcare organizations are often complex and difficult to secure. Devices and software continue to be used that have reached end-of-life, as upgrading is costly and often problematic. Many healthcare providers use software solutions that have been developed to work on specific – and now obsolete – operating systems and cannot be transferred to supported operating systems."[34]

---

[31] Krebs, *supra*, note 17.

[32] *2022 Breach Barometer*, Protenus, https://blog.protenus.com/key-takeaways-from-the-2022-breach-barometer (last accessed Feb. 29, 2024).

[33] *The Healthcare Industry is at Risk*, SwivelSecure https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last accessed Feb. 29, 2024).

[34] Steve Alder, Editorial: *Why Do Criminals Target Medical Records*, HIPAA Journal (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records/#:~:text=

57. Additionally, "[h]ospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it on easily – making the industry a growing target."[35]

58. Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2022, 5,150 healthcare data breaches of 500 or more individuals have been reported to Health and Human Services' Office of Civil Rights, resulting in the exposure or unauthorized disclosure of the information of 382,262,109 individuals— "[t]hat equates to more than 1.2x the population of the United States."[36]

59. The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than five percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[37]

60. In light of recent high profile data breaches at other health care partner and provider companies, Defendant knew or should have known that its electronic records and consumers' PII and/or PHI would be targeted by cybercriminals and ransomware attack groups.

61. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves the patients of the healthcare providers using Change

Healthcare%20records%20are%20so%20valuable,credit%20cards%20in%20victims'%20names (last accessed Feb. 29, 2024).

[35] *Id.*

[36] *Healthcare Data Breach Statistics*, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last accessed Feb. 29, 2024).

[37] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year (last accessed Feb. 29, 2024).

Healthcare's services especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

62. As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[38] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[39]

63. According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing

---

[38] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last accessed Feb. 29, 2024).

[39] *Managing Cyber Risks in an Interconnected World, Key Findings from the Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last accessed Feb. 29, 2024).

custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[40]

64. Further, according to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have [sic] been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[41]

65. Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII and PHI about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

66. Based on the value of its patients' PII and PHI to cybercriminals, Defendant certainly knew the importance of safeguarding that information as well as the foreseeable risk of failing to do so. However, Defendant still failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

## E. Defendant Failed to Comply with FTC Guidelines.

---

[40] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last accessed Feb. 29, 2024).

[41] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information (June 2007), https://www.gao.gov/new.items/d07737.pdf (last accessed Feb. 29, 2024).

67. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.[42]

68. The FTC's publication, "*Start with Security: A Guide for Business*," sets forth cybersecurity guidelines and best practices for businesses.[43] These guidelines note, *inter alia*, that businesses should: (a) protect the personal customer information they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on computer networks; (d) understand network vulnerabilities; (e) implement policies to correct security problems. The FTC guidelines further recommend that all businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.[44]

69. The FTC has brought enforcement actions against businesses for failing to protect customer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

70. Defendant was at all times fully aware of its obligation to protect the PII and PHI of patients because of its position as a business associate, which gave it direct access to reams of

[42] *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).
[43] Fed. Trade Comm'n, *supra*, note 25.
[44] *Id.*

patient PII and PHI from the healthcare providers with which it contracts. Defendant was also aware of the significant repercussions that would result from its failure to do so.

71. Despite its obligation, Defendant failed to properly implement basic data security practices, and Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII and PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

**F. Defendant Failed to Comply with Industry Standards.**

72. As discussed herein, experts studying cybersecurity routinely identify healthcare providers and partners as being particularly vulnerable to cyberattacks because of the value of the PII and/or PHI which they collect and maintain.

73. Several best practices have been identified that at a minimum should be implemented by healthcare service Business Associates like Defendant, including but not limited to; educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

74. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

75. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for

Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

76. Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**G. Defendant Change Healthcare Data Breach Response is Inadequate.**

77. The Data Breach affected millions of individuals across the United States.

78. Despite the breadth of the Data Breach's effects, Change Healthcare's response lacked sufficient information and remedies.

79. For one, Change Healthcare stated that it learned that patients' PII and PHI were on its breached server on February 21, 2024, yet has still failed to provide formal notice to those impacted by the Data Breach.

**H. Defendants Inadequate Data Breach Response Has Impacted Healthcare Providers.**

80. As a result of the Data Breach, Change Healthcare's systems had to be disconnected. Certain of these systems provide healthcare providers nationwide with the ability to process insurance claims and payment processes. Change has not properly rectified the ability for healthcare providers to assume their ordinary claims processing or revenue cycles services.

81. Because Change Healthcare disconnected its network systems, healthcare providers are unable to receive payments for the health services they render to patients. Without adequate alternatives, Plaintiff and the Class are unable to keep their business' cash flow at operational levels and will have to shoulder the burden of absorbing costs associated with running their businesses.

82. Specifically, many healthcare providers have not been able to receive any revenue associated with their healthcare services, as they remain unable to recoup costs from insurers or processing copays from patients. For example, Jennifer Fenton, executive director of Equine

Healing Collaborative, a nonprofit psychotherapy center with four locations in California, has stated that she has been unable to financially withstand the delay in processing claims, resulting in having to furlough give clinicians while waiting for $50,000 in unpaid claims.[45] Other physician-owned groups rely on credit lines and insurance claims to build up financial reserves to pay for salaries and supplies, but without Change Healthcare processing these claims, healthcare providers cannot withstand their expenses, even with taking additional lines of credit and using up personal savings.[46] Change Healthcare has failed to provide any updates regarding the restoration of normalcy in insurance claim processing timelines.

83. Healthcare providers are being deprived of the services they have paid for from Change Healthcare, resulting in significant challenges in patient care and financial losses for these providers and practices. Consequently, Plaintiff and members of the Class have been denied the promised benefits of their agreement with Change Healthcare, as they have paid for services that have not been delivered.

## I. Plaintiffs and Class Members Suffered Damages Due to the Data Breach.

84. Cyberattacks and data breaches at companies like Defendant are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

---

[45] *Medical Providers Fight to Survive After Change Healthcare Hack*, The Wall Street Journal (Mar. 1, 2024), https://www.wsj.com/articles/medical-providers-fight-to-survive-after-change-healthcare-hack-328c2e5a (last accessed Apr. 15, 2024).
[46] *Id*.

85. Researchers have found that among medical service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[47]

86. Researchers have further found that at medical service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[48]

87. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[49]

88. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

89. Moreover, theft of Private Information is also gravely serious. Private Information is an extremely valuable property right.[50]

90. Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious

---

47 *See* Nsikan Akpan, Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-andother-data-breaches-linked-to-uptick-in-fatal-heart-attacks (last visited Aug. 24, 2021).
48 *See* Sung J. Choi et al., Data Breach Remediation Efforts and Their Implications for Hospital Quality, 54 Health Services Research 971, 971-980 (2019). Available at https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203 (last visited Aug. 25, 2021).
49 *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (2007). Available at https://www.gao.gov/new.items/d07737.pdf (last visited Aug. 25, 2021).
50 *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

91. For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways.

92. As a direct and proximate result of Defendant's actions and omissions, Plaintiff and Class Members have suffered damages, including missed payments and out-of-pocket expenses associated with (i) the failure to receive payments for the services rendered to patients; (ii) costs associated with obtaining loans, lines of credit and other debts due to the failure to receive timely payment for the services rendered to patients; (iii) the costs for purchasing new healthcare payment software to process claims for payment; (iv) time spent trying to address the failure to be able to submit claims for payment, including time spent with insurance companies, time spent with patients and other third parties; and (iii) other costs resulting from the Data Breach .

**CLASS ACTION ALLEGATIONS**

93. Plaintiff brings this action against Defendant on behalf of themselves and all other persons similarly situated (the "Nationwide Class"), pursuant to Rule 23 of the Federal Rules of Civil Procedure.

94. Specifically, Plaintiff seeks to represent the Nationwide Class, subject to amendment as appropriate, and defined as follows:

> All entities in the United States and its territories who were injured by delays in processing claims and revenue cycle services as a result of the Data Breach.

95. Additionally, Plaintiff brings this action on behalf of the following California Class, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and defined as follows:

> All entities in the state of California whose use of Change Healthcare's services was disrupted by the Data Breach and were harmed.

96. The Nationwide Class and the California Class are referred to herein as "Class," unless otherwise stated.

97. Excluded from the Class are Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

98. The proposed Class is defined based on the information available to Plaintiff at this time. Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

99. Numerosity. Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Change Healthcare "processes 15 billion health care transactions annually and is involved in one in every three patient records."[51] According to Change Healthcare, it is connected to "more than 600,000 providers[.]"[52]

100. Commonality. Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether Defendant had a duty to use reasonable care in protecting its computer systems from the Data Breach;

---

[51] U.S. Department of Health and Human Services, *supra*, note 12.

[52] Change Healthcare https://www.changehealthcare.com/provider-payments (last accessed Apr. 15, 2024).

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant was negligent in maintaining, protecting, and securing its computer systems;

d. Whether Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

e. Whether Defendant's response to the Breach was reasonable;

f. Whether the Data Breach caused Plaintiff's and the Class's injuries;

g. What the proper damages measure is;

h. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct.

i. Whether Defendant's breach of its duty to implement reasonable security systems directly and/or proximately caused damages to Plaintiff and Class Members;

j. Whether Defendant adequately addressed and fixed the vulnerabilities that enabled the Data Breach;

k. Whether Defendant breached agreements with Plaintiffs and Class Members by disconnecting Change Healthcare's network; and

l. Whether Class Members are entitled to compensatory damages, punitive damages, and/or statutory or civil penalties as a result of the Data Breach.

101. Typicality. Plaintiff's claims are typical of the claims of the Class Members. The claims of the Plaintiff and Class Members are based on the same legal theories and arise from the same unlawful and willful conduct. Defendant processed insurance claims and payments for

Plaintiff's and Class Members' healthcare businesses, and as a result of the Data Breach has delayed payments.

102. Adequacy of Representation. Plaintiff is an adequate representative of the Class because its interests do not conflict with the interests of Class Members. Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to those of the other Members of the Class, and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. In addition, Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

103. Superiority. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class Members is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

104. Predominance. Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class Member suffered damages by that conduct.

105. Injunctive Relief. Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

106. Ascertainability**:** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

**COUNT ONE**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Nationwide Class)**

107. Plaintiff restates and realleges the allegations contained in every preceding paragraph as if fully set forth herein.

108. Defendant owed a duty to Plaintiff and the members of the Class to take reasonable care in managing and protecting the highly sensitive data it managed and stored on behalf of its clients. This duty arises from multiple sources.

109. Defendant owed a common law duty to Plaintiff and Class Members to implement reasonable data security measures because it was foreseeable that hackers would target Defendant's data system, software, and servers containing sensitive PII and PHI , and that its computer systems could be impacted by a breach of Defendant's computer systems resulting in harm to Plaintiff and the Class. Defendant alone controlled its computer systems, infrastructure, and cybersecurity. Defendant further knew or should have known that if hackers breached its data system, they would inflict injury upon Plaintiff and Class Members by compromising the computer systems that allowed for medical claims to be processed and paid. Furthermore, Defendant knew or should have known that if hackers accessed their computer systems, the responsibility for remediating and mitigating the consequences of the breach would largely fall on the entities who relied on Defendant's systems to submit healthcare claims for payment. Therefore, the Data

Breach, and the harm it caused Plaintiff and Class Members, was the foreseeable consequence of Defendant's unsecure, unreasonable data security measures.

110. Change Healthcare is a HIPAA covered business associate that provides services to various healthcare providers (*i.e.*, HIPAA "Covered Entities"). As a regular and necessary part of its business, Change Healthcare was required to implement reasonable data security measures because it collects and stores the highly sensitive PHI of its clients' patients. Change Healthcare is required under federal law to maintain the strictest confidentiality of the patients' PHI that it acquires, receives, and collects, and Change Healthcare is further required to maintain sufficient safeguards to protect that PHI from being accessed by unauthorized third parties.

111. Additionally, Section 5 of the FTC Act, 15 U.S.C. § 45, required Defendant to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of Defendant's duty to Plaintiff and Class Members. Section 5 prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendant of failing to use reasonable measures to protect highly sensitive data. Defendant, therefore, was required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of Defendant's duty to adequately protect sensitive information. By failing to implement reasonable data security measures, Defendant acted in violation of § 5 of the FTC Act.

112. Defendant is obligated to perform its business operations in accordance with Federal, State as well as industry-specific standards. Industry standards are another source of duty and obligations requiring Defendant to exercise reasonable care with respect to Plaintiff and Class

Members by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and Class Members.

113. Defendant breached its duty to Plaintiff and Class Members by implementing unreasonable data security measures and by failing to keep data security "top-of-mind" despite understanding and writing about the risk of data breaches involving highly sensitive data and touting its own security capabilities.

114. Defendant was fully capable of preventing the Data Breach. Defendant, as a sophisticated and experienced technology company, knew of data security measures required or recommended by the FTC, state laws and guidelines, and other data security experts which, if implemented, would have prevented the Data Breach from occurring at all, or limited the scope and depth of the Data Breach. Defendant thus failed to take reasonable measures to secure its system, creating vulnerability to a breach.

115. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will continue to suffer injury, including but not limited to, out of pocket costs resulting from the Data Breach, disruption and interruption of their business and healthcare services to patients.

**COUNT TWO**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Nationwide Class)**

116. Plaintiff restates and realleges all proceeding factual allegations as if fully set forth herein.

117. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Defendant for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

118. Change Healthcare is a HIPAA covered business associate that provides services to various healthcare providers (*i.e.*, HIPAA "Covered Entities"). As a regular and necessary part of its business, Change Healthcare collects and stores the highly sensitive PHI of its clients' patients. Change Healthcare has a duty under federal law to maintain the strictest confidentiality of the patients' PHI that it acquires, receives, and collects, and Change Healthcare is further required to maintain sufficient safeguards to protect that PHI from being accessed by unauthorized third parties.

119. Defendant violated HIPAA and Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII and PHI it obtained and stored and the foreseeable consequences of this Data Breach.

120. Defendant's violation of HIPAA and Section 5 of the FTC Act constitute negligence *per se*.

121. Plaintiff and Class Members are consumers within the class of persons HIPAA and Section 5 of the FTC Act were intended to protect.

122. Moreover, the harm that has occurred is the type of harm that HIPAA and the FTC Act were intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

123. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**COUNT THREE**

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §17200**

**(On Behalf of Plaintiff and the California Class)**

124. Plaintiff restates and realleges the allegations contained in every preceding paragraph as if fully set forth herein.

125. At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, et seq., which prohibits, inter alia, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code §17200.

126. Change Healthcare also engaged in business acts and practices deemed "unfair" under the UCL, because the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs and California Class members that by failing to maintain reasonable security practices and procedures as alleged herein and as required by law, resulted in the continued and ongoing threat of additional delays and disruption of Plaintiff's and the California Class's ability to provide business and healthcare services to its patients.. Unfair acts under the UCL have been interpreted using three different tests: (1) whether the public policy which is a predicate to a consumer unfair competition action under the unfair prong of the UCL is tethered to specific constitutional, statutory, or regulatory provisions; (2) whether the gravity of the harm to the consumer caused by the challenged business practice outweighs the utility of the defendant's conduct; and (3) whether the consumer injury is substantial, not outweighed by any countervailing benefits to consumers or competition, and is an injury that consumers themselves could not reasonably have avoided. Defendant's conduct is unfair under each of these tests. Change Healthcare's conduct alleged is unfair under all of these tests.

127. Change Healthcare knew or should have known that since their computer networks and data security practices were inadequate to safeguard against ransomware attacks, it would result in the Data Breach, and ultimately in the shutdown of Defendants' computer networks. Defendants' actions in engaging in the unfair practices and unlawful acts alleged herein were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and members of the California Class.

128. Defendants engaged in unfair acts and practices by failing to maintain reasonable security practices and procedures as alleged herein and as required by law. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and California Class Members. Defendants' practices were also contrary to legislatively declared and public policies that call for the protection of consumer data and ensure that entities who are entrusted with PHI and PII utilize appropriate security measures, as reflected by laws like the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et. seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), California's Confidentiality of Medical Information Act (Civil Code §56, *et seq.*), and California's Insurance Information and Privacy Protection Act (Ins. Code §791, *et seq.*). The harm these practices caused to Plaintiff and the California Class Members outweighed their utility, if any.

129. Defendants engaged in unlawful business practices by violating the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, *et. seq.*), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), California's Confidentiality of Medical Information Act (Civil Code § 56 *et seq.*), and California's Insurance Information and Privacy Protection Act (Ins. Code §791, *et seq.*).

130. Plaintiff and California Class Members seek relief under Cal. Bus. & Prof. Code § 17200, et. seq., including, but not limited to, restitution to Plaintiff and Class Members of money or property that the Defendants may have acquired by means of their unlawful and unfair business practices, restitutionary disgorgement of all profits accruing to Defendants because of their unlawful and unfair business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civil Pro. §1021.5), and injunctive or other equitable relief.

131. As a direct and proximate result of Change Healthcare's unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages. Change Healthcare's inability to abide by adequate data security practices continues to cause financial harm to Plaintiff and the California Class.

132. Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Apple, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under California Business & Professions Code section 17200.

**COUNT FOUR**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Nationwide Class)**

133. Plaintiff restates and realleges the allegations contained in every preceding paragraph as if fully set forth herein.

134. Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

135. An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendant's common law and other duties to act reasonably with respect to safeguarding patient. Plaintiff alleges Defendant's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff and the Class continue to suffer injury due to the continued and ongoing threat of additional delays and disruption of their business and healthcare services to its patients.

136. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed, and continues to owe, a legal duty to secure the sensitive information with which it is entrusted, and to notify impacted individuals of the Data Breach under the common law, HIPAA, and Section 5 of the FTC Act;

b. Defendant breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure customers' personal and financial information; and

c. Defendant's breach of its legal duty continues to cause harm to Plaintiff and the Class.

137. The Court should also issue corresponding injunctive relief requiring Defendant to employ adequate security protocols consistent with industry standards to protect their clients' data.

138. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendant's data system. If another breach of Defendant's data system occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full, and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other

damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class.

139. The hardship to Plaintiff and the Class if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff and Class Members will likely be subjected to further monetary harm and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

140. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief as follows:

a. For an Order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiff and her Counsel to represent the Class;

b. For an Order finding in favor of Plaintiff and the Class on all counts asserted herein;

c. For damages in an amount to be determined by the trier of fact;

d. Declaratory and injunctive relief as described herein;

e. Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

f. Awarding pre- and post-judgment interest on any amounts awarded; and

g. Awarding such other and further relief as may be just and proper.

**JURY TRIAL DEMANDED**

A jury trial is demanded on all claims so triable.

Dated: April 18, 2024

Respectfully submitted,

/s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV, BPR 23045
Grayson Wells BPR 039658
**STRANCH, JENNINGS & GARVEY PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

**SCOTT+SCOTT ATTORNEYS AT LAW**
Joseph P. Guglielmo (*pro hac vice* forthcoming)
Amanda M. Rolon (*pro hac vice* forthcoming)
Ethan S. Binder (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-4478
jguglielmo@scott-scott.com
arolon@scott-scott.com
ebinder@scott-scott.com

*Counsel for Plaintiff and the Putative Class*